**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

| UNITED STATES OF AMERICA | CRIMINAL ACTION |
|---|---|
| VERSUS | |
| CRISTIAN CONSTANTIN, et al. | NO. 19-36-SDD-RLB |

## **RULING**

This matter is before the Court on the *Motion to Suppress*[1] filed by Defendant, Cristian Constantin ("Constantin"). The motion is opposed.[2] This Court held an evidentiary hearing on the *Motion* on October 30, 2019.[3] For the reasons that follow, the Court finds that Constantin's *Motion* shall be DENIED.

**I.  FACTUAL BACKGROUND**

On March 10, 2019, acting on a tip from the United States Secret Service about a suspected access device fraud scheme, deputies with the East Baton Rouge Sheriff's Office (EBRSO) located the Defendant, Christian Constantin ("Constantin") at a Capital One Bank on Siegen Lane in Baton Rouge. Constantin was accompanied by a woman who was carrying a bag containing more than one hundred re-encoded credit cards and various forms of identification, some bearing Constantin's photograph but identifying him as William Miclescu.[4] Constantin was arrested and booked into EBR Parish Prison.

---

[1] Rec. Doc. No. 83.
[2] Rec. Doc. No. 90.
[3] Rec. Doc. No. 119.
[4] Rec. Doc. No. 90-2, *Affidavit of Senior Special Agent Kevin Bodden*, pp. 6-7.
57707

Four days later, on March 14, 2019, Constantin was transported from Parish Prison to the EBRSO Financial Crimes Division to be interviewed by Corporal Leigh Rice ("Corporal Rice") about his involvement in the alleged fraud scheme. Before the interview began, Corporal Rice presented Constantin with a *Miranda* rights waiver form, which he signed after reviewing it with her. During the subsequent interview, Constantin made statements admitting to criminal conduct – the conduct ultimately charged in the *Indictment* out of which this case arises.[5]

Constantin now moves to have his statements suppressed, arguing that he did not knowingly waive his *Miranda* rights. Constantin's native language is Romanian, and although he is able to "speak a passable amount of English,"[6] the defense argues that Constantin's interview with Corporal Rice was marked by "breakdowns in communication,"[7] including times when he "asks questions that demonstrate his lack of English comprehension"[8] or "responds to open-ended questions with 'yes.'"[9] Moreover, Constantin asserts that he was a member of the gypsy social class in Romania and contends that the fact that he "is 19, has no degree, and has no familiarity with the criminal justice system"[10] weighs against a finding that his waiver was knowing.

---

[5] Specifically, Constantin is charged with Possession of Fifteen or More Counterfeit or Unauthorized Access Devices, in violation of 18 U.S.C. 1029(a)(3) and 18 U.S.C. 1029(c)(1)(A)(i), and Illegal Possession of Device-Making Equipment, in violation of 18 U.S.C. 1029(a)(4) and 18 U.S.C. 1029(c)(1)(A)(2).
[6] Rec. Doc. No. 83-1, p. 1.
[7] *Id.*
[8] *Id.* at p. 2.
[9] *Id.* at p. 4.
[10] *Id.*
57707

The Government denies that Constantin's limited English proficiency was a barrier to a knowing waiver of his *Miranda* rights, arguing that "[m]erely because this defendant experienced difficulty with English did not mean that he did not understand his *Miranda* warning."[11] The Government argues that Constantin "was clear when he informed the deputy that he understood [his] rights."[12]

## II. LAW AND ANALYSIS

A defendant's waiver of his *Miranda* rights is effective only if knowing and voluntary.[13] The Government bears the burden of proving by a preponderance of the evidence that Constantin knowingly and voluntarily waived his *Miranda* rights.[14] The validity of a *Miranda* waiver is assessed by considering the totality of the circumstances.[15] The United States Supreme Court has further described the inquiry into the validity of a waiver as follows:

> The inquiry whether a valid waiver has occurred has two distinct dimensions. First, the relinquishment of the right must have been **voluntary** in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a **full awareness** of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.[16]

The voluntariness of Constantin's waiver – or, put another way, the absence of intimidation, coercion, or deception on the part of Corporal Rice – is not the focus of the

---

[11] Rec. Doc. No. 90, p. 3.
[12] *Id.*
[13] *North Carolina v. Butler*, 441 U.S. 363, 379 (1979).
[14] *United States v. Hurtado*, 905 F.2d 74, 76 (5th Cir. 1990).
[15] *Miranda v. Arizona*, 384 U.S. at 475-77 (1966).
[16] *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 1141, 89 L. Ed. 2d 410 (1986)(emphasis added).
57707

instant *Motion*. The video of Constantin's interview with Corporal Rice is in evidence and has been fully reviewed by the Court. At the suppression hearing, the Government pointed out Corporal Rice's calm tone of voice and the amount of time she took explaining the *Miranda* waiver form to Constantin; the defense agreed that the Corporal "did her best and tried" and agreed that the taped interview did not reveal "a lot of guile" on Corporal Rice's part. After hearing testimony and watching portions of the taped interview in court, the Court found there was no doubt that Corporal Rice behaved in a "very mannerly and professional way" throughout her interaction with Constantin. Because there is no evidence of intimidation or coercion, the Court finds that, to the extent that voluntariness was even disputed, the Government carried its burden of proving that Constantin's *Miranda* waiver was voluntary under the totality of the circumstances.

The crux of the dispute is the *knowingness* of Constantin's waiver – that is, whether in light of what even the Government called his "broken English," Constantin validly waived his *Miranda* rights when they were presented and explained to him in English, accompanied by an English-language *Miranda* waiver form. In support of its contention that Constantin's waiver was knowing, the Government called two witnesses and introduced two exhibits.

The Government's first witness, Captain Richard St. Pierre ("Captain St. Pierre"), testified that he works with the EBRSO Financial Crimes Division and that on March 10, 2019, he met with Constantin at EBRSO headquarters and advised him of his *Miranda* rights. Captain St. Pierre then transported Constantin to EBR Parish Prison. Captain St. Pierre noted that during the ride, Constantin inquired about the female individual who was arrested with him (in fact, Constantin's wife) and "alluded" to the fact that she was a

57707

juvenile. Captain St. Pierre testified that Constantin spoke with "broken English" and that he had to ask Constantin to repeat himself several times to understand him. Asked by the Government if Constantin appeared to understand what was said to him, Captain St. Pierre stated, "it appeared that he did at that point." On cross-examination, Captain St. Pierre reiterated that Constantin's English was "very broken" and that he had trouble understanding him. He suggested that Constantin perhaps "portrayed" different levels of comprehension in different situations, noting that when they were in Captain St. Pierre's vehicle, he seemed to suddenly understand better when he realized that he was being transported to Parish Prison.

To the Court, the fact that Constantin was able to express to Captain St. Pierre that he was concerned about his wife and that his wife was a juvenile (which resulted in EBRSO choosing not to book her into Parish Prison) is evidence of Constantin's ability to communicate in English. Additionally, Captain St. Pierre testified that he overheard a conversation between Constantin and a nurse at Parish Prison, where Constantin told the nurse about how he became involved in the access device fraud scheme, including how he was "picked up" by a Mexican individual at a gas station in Florida. Of course, although they are evidence of his English ability, Constantin's conversations with Captain St. Pierre and the prison nurse do not prove that he knowingly waived *Miranda*. But these instances of spontaneous conversation do contribute to the Court's perception of the totality of the circumstances surrounding the waiver – specifically, to the Court's perception that Constantin was reasonably comfortable communicating in English.

The Government's next witness was Corporal Leigh Rice. She testified that she advised Constantin of his *Miranda* rights in the EBRSO interview room on March 14, 2019,

57707

and she identified the Government's Exhibit 1 as the "Your Rights" form that she completed with Constantin. The use of this form is an important fact. In cases where defendants challenge the validity of their waiver of *Miranda*, the Fifth Circuit has counseled that the presentation of rights in written form weighs in favor of a valid waiver. For example, in *United States v. Collins*, the United States Court of Appeals for the Fifth Circuit held that a defendant was effectively informed of his *Miranda* rights when "the agents gave him a written waiver-of-rights form which detailed these rights"[17] and an agent testified that the defendant appeared to read and understand the form. Similarly, in *United States v. Broussard*, the Fifth Circuit affirmed the district court's finding of a valid waiver on the basis that "[the defendant] was immediately informed of his *Miranda* rights in Spanish, asked after each warning whether he understood, and given an opportunity to read a Spanish *Miranda* warning card."[18]

*Collins* and *Broussard* are distinguishable from the instant case in an important way – the defendants therein each reviewed a *Miranda* form that was printed in their native language. Constantin was given an English-language form. Moreover, it cannot be overlooked that the Fifth Circuit has indicated a preference for the use of a defendant's native language during the *Miranda* process. In *United States v. Garcia Abrego*, the Fifth Circuit affirmed the district court's finding of a valid waiver where "the law enforcement officers who interviewed [the Spanish-speaking defendant] read him his *Miranda* rights in Spanish and that he stated to them that he understood each of these rights."[19] Likewise, in *United States v. Marin Gutierrez*, the Fifth Circuit cited the fact that "[the defendant]

---

[17] 40 F.3d 95, 98 (5th Cir. 1994).
[18] *United States v. Broussard*, 80 F.3d 1025, 1034 (5th Cir. 1996).
[19] *United States v. Garcia Abrego*, 141 F.3d 142, 171 (5th Cir. 1998).
57707

was read *Miranda* warnings in Spanish, a language in which she is fluent"[20] as evidence tending to show that her waiver was valid.

However, the preference for administering *Miranda* rights in the defendant's native language is just that – a preference, not a requirement. As the Government points out in its *Opposition to Defendant's Motion to Suppress*, other courts have held that even defendants with poor or "broken" English can knowingly waive *Miranda* after being *Mirandized* in English.[21] Obviously, the preference for the use of the defendant's native language arises because it increases the likelihood that the accused understands his or her rights. But the fact that Constantin was *Mirandized* in English does not compel the conclusion that he did not understand his rights. In fact, the Court notes that when Corporal Rice asks Constantin to read the English-language form out loud, the video shows him reading it out loud, quietly, but seemingly with relative ease.

Defense counsel's cross-examination of Corporal Rice involved a detailed review of the Government's Exhibit 2, the video of her interview with Constantin. The Government, which bears the burden of proving that Constantin knowingly waived his *Miranda* rights, posits that the video is its strongest evidence of a knowing waiver. In its closing argument, the Government submitted that "the video says it all." The Court agrees that the video is the most probative and most direct evidence of the circumstances surrounding Constantin's *Miranda* waiver. That is not to say that the video offers a clear answer to the question of whether Constantin's waiver was knowing. In fact, the video paints a somewhat conflicting picture of Constantin's ability to understand English.

---

[20] *United States v. Marin-Gutierrez*, 210 F. App'x 361, 363 (5th Cir. 2006).
[21] See *U.S. v. Rodriguez-Preciado*, 399 F.3d 1118 (9th Cir. 2005); *U.S. v. Guay,* 108 F.3d 545 (4th Cir. 1997); *Campaneria v. Reid*, 891 F.2d 1014 (2d Cir. 1989); *U.S. v. Bernard S.,* 795 F.2d 749 (9th Cir. 1986).
57707

At times, the exchange between Constantin and Corporal Rice is so labored or nonsensical that it calls into question whether Constantin has even a rudimentary understanding of the situation, let alone a "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."[22] For example:

> CORPORAL RICE: So, at any point, you don't wanna answer any questions, you tell me I'm done, I don't wanna answer any more questions. That's what that means, okay? So look over that for me and I need your initials on each line.
> CONSTANTIN: [looking at form] That means I answer, when I . . .?
> CORPORAL RICE: You don't have to. You have the right to remain silent, you don't have to answer questions, or yes, you can answer questions.
> CONSTANTIN: If I put initial, what does mean?
> CORPORAL RICE: That means you understand what that means.
> CONSTANTIN: I want to answer. . .
> CORPORAL RICE: If you want to, yes.

Or:

> CORPORAL RICE: That's what that means. That if you can't afford one, the judge will appoint a public defender for you.
> CONSTANTIN: But – sure – I'm [unintelligible] have one . . .
> CORPORAL RICE: Uhhh. . .if you want one, yeah.
> CONSTANTIN: Yes, I'm gonna have one. So I don't have to sign this. . .
> CORPORAL RICE: No no, you just sign this, basically saying you know
> CONSTANTIN: Oh, okay.

At other times, Constantin appears confused by an explanation offered by Corporal Rice at first, but later states that he understands. For example:

> CORPORAL RICE: You have the right to remain silent or to answer questions. We inform you that anything you say can be used against you in court.
> CONSTANTIN: [indicates confusion and leans forward to look at "Your Rights" form]
> CORPORAL RICE: We inform you that anything that you say, sir – any answers to any questions in here –
> CONSTANTIN: Yes, yes, you can. . .
> CORPORAL RICE: Be used in court.

---
[22] *United States v. Cardenas*, 410 F.3d 287, 292–93 (5th Cir. 2005)(quoting *Andrews*, 22 F.3d at 1337)(internal citations omitted).

57707

> CONSTANTIN: I understand.

Or:

> CORPORAL RICE: You have the right to talk to a lawyer. Know what a lawyer is? An attorney?
> CONSTANTIN: Right now, I don't know. But I'm pretty sure he's gonna, my family's gonna call me a lawyer.
> CORPORAL RICE: Alright. So you can talk to a lawyer for any advice before you answer any questions or talk to me, okay? And you may have your lawyer with you, if you answer questions or wanna answer questions with me. Do you understand that?
> CONSTANTIN: Yes, I understand.

After reviewing the form with Corporal Rice, Constantin makes several statements that seem to suggest not only English proficiency but a decent grasp on the content of his *Miranda* rights. For example, as he prepares to sign the waiver form, he states, "I'm gonna sign this, because I want to tell what is happened exactly, without to depending on my lawyer [sic]. I do not trust no lawyers, no nothing, I wanna trust me." Later, he reiterates, "I wanna talk to you right now. But, you know, the rest of the things, I want my lawyer." Asked by Corporal Rice if he is okay making a statement without a lawyer present, he clearly states, "Yes, yes."

Clearly, Constantin is aware that he is allowed to have a lawyer present, since he expresses that he does not want one in the interview room that moment, though he says he would like to have one at future "things." Constantin goes beyond a mere one-word or rudimentary response to his rights; he explicitly states that he wants to sign because he wants to talk, and he wants to talk because he wants to trust himself, not a lawyer. Constantin also appears to understand that the court would appoint him a lawyer if necessary; when Corporal Rice explains that particular right, he specifies that no, he wants to "do [his] own," referring to his earlier statement that his family is likely to call a

lawyer on his behalf. Although he initially balks when Corporal Rice says that his statements can be used against him in court, Constantin listens to further explanation and then states, "I understand."

But does Constantin *really* understand? To conclude that Constantin did not understand, the Court would have to disregard the multiple times that he clearly stated, "I understand" and embark on utter speculation as to what was in Constantin's mind. The Court credits the defense argument that it was merely Constantin's "default" to nod, smile, and say that he understood, as a means of moving as smoothly as possible through a very stressful situation. The Court also takes into consideration the evidence that Constantin was so confused about the American criminal justice system that, during the interview, he may have believed that he was on "probation." For example, before he signs the waiver form, Constantin tells Corporal Rice that he will probably want his lawyer for "other things," like "[his] probation," gesturing to a piece of paper in the chest pocket of his shirt. Later, Corporal Rice looks at the paper, asking him, "This is your probation?" to which he responds "Yes." It is not clear from the video what the paper is, nor what, exactly, Constantin thinks his status is. The above arguments, plus the potential cultural barriers to understanding for this 19-year-old Romanian member of the gypsy social group with no determined level of education, do give the Court pause when considering if Constantin truly understood the "consequences of the decision"[23] to waive *Miranda*.

However, it is the totality of the evidence which informs the Court's conclusions. Once the interview moves beyond the *Miranda* warning and becomes a more free-flowing

---

[23] *United States v. Cardenas*, 410 F.3d 287, 292–93 (5th Cir. 2005)(quoting *Andrews*, 22 F.3d at 1337)(internal citations omitted)(emphasis added).
57707

conversation, Constantin speaks a lot – not unhaltingly, but well enough that he makes himself understood by Corporal Rice, and well enough for the Court to understand his communication. There is precedent to suggest that Constantin's ability to carry on a conversation in English means his waiver was knowing. In *United States v. Segovia-Ayala*, a 2015 Western District of Louisiana case that was later affirmed by the Fifth Circuit, the court upheld a *Miranda* waiver where the defendant, a native Spanish speaker, "spoke fairly good, but not great, English."[24]

The *Segovia* court noted that the defendant and the officer who initiated the traffic stop "talked without difficulty about his itinerary, his reason for the trip, and other matters. On the few occasions when [the defendant] did not understand a question, [the officer] rephrased the question, and the conversation continued."[25] The Western District found that the defendant's level of English proficiency (which sounds roughly similar to Constantin's, as evidenced by the video) was not an impediment to a valid waiver.

In the 2015 case *United States v. Hernandez,* this Court applied the Fifth Circuit's holding that "where there is sufficient conversation between the suspect and law enforcement officers to demonstrate that the suspect had an adequate understanding of English to fully comprehend the situation, a finding that consent was voluntary may be proper"[26] to the issue of what constitutes a valid *Miranda* waiver. The defendant in *Hernandez* filed a Motion to Suppress, arguing that, as a native Spanish speaker, she had not adequately understood her *Miranda* rights to be able to knowingly waive them.

---

[24] *United States v. Segovia-Ayala*, No. 14-CR-00167 01, 2015 WL 745653, at *6 (W.D. La. Feb. 18, 2015), aff'd, 648 F. App'x 403 (5th Cir. 2016).
[25] *Id*.
[26] *United States v. Hernandez*, No. CRIM.A. 4-119-SDD, 2015 WL 867930, at *15 (M.D. La. Feb. 27, 2015)(quoting *United States v. Alvarado*, 898 F.2d 987, 991 (5th Cir.1990)).
57707

The record reflected that Hernandez was read her *Miranda* rights in English and responded "yes" when asked if she understood. Officers placed the defendant in the back seat of a police unit, at which point she "indicated that she wanted to cooperate with law enforcement and proceeded to describe, in English, her role and participation in trafficking methamphetamine."[27]

In *Hernandez*, this Court found that "the Defendant was advised of her rights in a language that she sufficiently understands. As such, the fact that the Defendant was not informed of her rights in Spanish, even if that is the language she prefers or is more comfortable with, does not negate the validity of what were otherwise knowing, intelligent and voluntary waivers of the Defendant's *Miranda* rights."[28] The facts presented here are analogous – both Hernandez and Constantin were able to describe their criminal conduct in English in some detail and to appear to understand their rights, even if they would have understood them more readily in their native language. Likewise, in *United States v. Ramos-Gonzales*, a Fifth Circuit case where the court upheld a defendant's waiver based on evidence of his English proficiency, the court's decision was based in part on "a videotape of the stop [that] showed [the defendant] communicating with the officer,"[29] like the video in evidence here.

Much of the case law on the validity of *Miranda* waivers by individuals with limited English proficiency involves Spanish speakers. Obviously, Romanian is a less commonly spoken language in Baton Rouge, Louisiana, and Romanian interpreters are perhaps less easily arranged. On that subject, the Court notes Corporal Rice's testimony on cross-

---

[27] Id. at *2.
[28] Id. at *15.
[29] *United States v. Ramos-Gonzalez*, 224 F. App'x 364, 365 (5th Cir. 2007).
57707

examination that, before her interview with Constantin, she called a local Romanian Orthodox church in hopes that they could provide interpreting services. Her attempt to secure an interpreter suggests that she anticipated or suspected a language barrier would arise in her interview with Constantin. Although the Court does not doubt that an interpreter (or even the use of one of the many ubiquitous translation applications such as Google Translate) would have been beneficial to all parties, the video evidence simply does not reflect that the language barrier between Corporal Rice and Constantin presented an insurmountable obstacle to Constantin's understanding.

For the above reasons, the Court finds that Constantin's *Motion* should be denied. Although his English falters at times during the *Miranda* portion of his interview with Corporal Rice and his level of comprehension is at times unclear, looking at the totality of the circumstances, Constantin not only conversed successfully with multiple law enforcement officers in English, he made multiple, unequivocal statements in English regarding his desire to proceed without counsel present. While there is reason to be skeptical of Constantin's true comprehension of his rights, the Court finds that the video and testimony introduced by the Government shows by a preponderance of the evidence that Constantin's waiver was made knowingly.

## III. CONCLUSION

**IT IS HEREBY ORDERED** that Constantin's *Motion to Suppress*[30] shall be DENIED.

Signed in Baton Rouge, Louisiana on <u>November 7, 2019</u>.

	*Shelly D. Dick*
	_____
	**CHIEF JUDGE SHELLY D. DICK**
	**UNITED STATES DISTRICT COURT**
	**MIDDLE DISTRICT OF LOUISIANA**

---

[30] Rec. Doc. No. 83.

57707